**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| BURTON L. RELETHFORD,      ) | Civil Action No.: 2:23-cv-5075-RMG-MGB |
| ) | |
| Plaintiff,      ) | **COMPLAINT** |
| ) | **Violation of the ADA/ADAAA;** |
| vs.      ) | **Violation of the FMLA; Slander** |
| ) | |
| FIDELITY BROKERAGE SERVICES, LLC, ) | |
| ) | **JURY TRIAL DEMANDED** |
| Defendant.      ) | |
| _____) | |

The plaintiff above named, by and through undersigned counsel, complains of the acts of the defendant as follows:

**PARTIES AND JURISDICTION**

1.      That the plaintiff is a citizen and resident of the County of Charleston, State of South Carolina.

2.      That, upon information and belief, the defendant Fidelity Brokerage Services, LLC ("defendant" of "Fidelity") is a foreign limited liability corporation doing business and maintaining offices and agents in various counties throughout the State of South Carolina, including the County of Charleston, State of South Carolina.

3.      That this court has federal question jurisdiction of the above-styled action pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), the ADA Amendments Act of 2008 ("ADAAA") (collectively referred to as the "ADA" or "ADA/ADAAA"), 42 U.S.C. § 12203 ("ADA/ADAAA retaliation"), the Family Medical Leave Act, 29 U.S.C. §§ 2601-2654 ("FMLA") and 28 U.S.C. § 1331.

4.     That venue for all causes of action stated herein lies in the District of South Carolina, Charleston Division, in that, pursuant to 28 U.S.C. § 1391(b), the parties reside and defendant does business in this district and division, and a substantial part of the events giving rise to plaintiff's claims occurred here.

## CONDITIONS PRECEDENT

5.     That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below.

6.     That at all relevant times as defined by the ADA/ADAAA, defendant employed fifteen (15) or more employees and, as such, is an "employer" as defined by the ADA/ADAAA and is otherwise subject to said Act.

7.     That on or about July 26, 2022, and as a result of defendant's discriminatory conduct, all of which is more fully described below, plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based upon disability and/or perceived disability (in the form of harassment and termination) and retaliation (in regard to his firing), all under the ADA/ADAAA.  On or about April 11, 2023 plaintiff timely submitted an Amended or Supplemental Charge of Discrimination to the EEOC alleging continued post-termination retaliation under the ADA in the form of slander, disclosing plaintiff's private medical information to third parties and interfering with his business relations.

8.     That on or about July 26, 2023 plaintiff received Notices of Rights to Sue from the EEOC regarding both his initial and amended Charges described in Paragraph 7 above.

2

9.    That plaintiff has timely filed the foregoing action within ninety (90) days of the date on which he received the Notices of Rights to Sue described above in Paragraph 8.

**FACTUAL ALLEGATIONS**

10.    That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 9 hereinabove as fully as if set forth verbatim.

11.    That plaintiff is a 36-year-old male who has a long-term history of battling anxiety and ADHD.  Plaintiff has suffered from these conditions most of his life and otherwise sought medical treatment, received a diagnosis, and began treatment for these impairments early in his life when he was still a child.  Moreover, plaintiff has suffered from the symptoms of borderline personality disorder since early adulthood, he has suffered from depression since at least early 2020, and from addiction issues (alcohol) since at least the spring of 2020.

12.    That as far as diagnoses go, while plaintiff was diagnosed with anxiety and ADHD during his childhood, plaintiff was first diagnosed with depression in early 2020 and addiction issues in or around the spring of 2020.  Plaintiff was not diagnosed with borderline personality disorder until in or around December of 2021 or January of 2022 - after his wrongful termination from defendant.

13.    That thus, at the time plaintiff commenced his employment with defendant in or around January of 2021, plaintiff had been diagnosed with, and was experiencing symptoms from, severe anxiety, ADHD, depression and addiction issues.  And, while not yet diagnosed, plaintiff was also suffering from the symptoms of borderline personality disorder during the entire course of his employment with defendant.

14.    That at that time (and for the length of plaintiff's employment at defendant), plaintiff treated these impairments with intense counseling by a psychologist, Dr. Dominick

3

Locicero ("Locicero"), who plaintiff would see once a week, along with visits to his psychiatrist once every two (2) weeks. Plaintiff also treated these impairments with various medications including, but not limited to, Zoloft (an antidepressant), Wellbutrin (an atypical antidepressant), Rexulti (an "add-on" antidepressant medication often prescribed to provide a boost to existing antidepressant medication(s) the patient is already taking), Xanax (a fast-acting benzodiazepine for anxiety), and Trazadone (an antidepressant used in small doses as a sleeping aid).

15. That in or around early 2021, plaintiff's physicians took him off many of the above medications as plaintiff was feeling better and, instead, put plaintiff on Vyvanse, a stimulant used to treat ADHD (which can also be used "off label" to treat depression), and continued plaintiff on Xanax for anxiety.

16. That plaintiff's anxiety made him feel nervous, restless and tense; it would give him a sense of impending danger or doom, an increased heart rate, cause him to sweat, to have trouble concentrating, and trouble sleeping. At the same time, plaintiff's symptoms from his adult ADHD included hyperactivity, impulsivity, restlessness, inattention, lack of attention, poor listening skills, being easily distracted, losing things, and forgetful in daily activities. Symptoms from plaintiff's depression included feeling sad or empty, feeling hopeless or helpless, feeling excessive guilt, lack of interest or pleasure in activities, irritability, loss of energy, loss of sleep, difficulty concentrating, physical pain, and thoughts of death or suicide, Finally, borderline personality disorder, is a much harder impairment to treat and can be more serious than the other impairments discussed above. Symptoms can include fear of abandonment, a pattern of unstable, intense relationships, rapid changes in self-identity and self-image, paranoia, impulsive and risky behavior such as gambling, spending sprees, unsafe sex, and promiscuity, as well as suicidal thoughts and inappropriate anger. Plaintiff experienced all

4

of the above-described symptoms from his borderline personality disorder while employed with defendant except for the inappropriate anger and paranoia. Finally in this regard, like many other people with the above types of impairments, plaintiff self-medicated by using alcohol on the weekends and after work hours, which ultimately caused plaintiff to suffer from addiction issues.

17.    That all or most of plaintiff's impairments are long-term, chronic, and even lifetime illnesses or impairments. These impairments significantly limit plaintiff in the major life activities of sleeping, concentrating, listening, thinking, focusing, interacting with others, and working – just to name a few.

18.    That despite the above, plaintiff could always perform the essential duties of his jobs and typically did so in exemplary fashion. As serious as they are, plaintiff never let these impairments bring him down or stop him from working hard and achieving his goals.

19.    That on or about January 11, 2021 defendant hired plaintiff as a Financial Consultant at its Mt. Pleasant, South Carolina office. At the time, there were approximately four (4) or five (5) other Financial Consultants working at the Mt. Pleasant office. In this position, plaintiff reported to a Vice-President and Branch Leader, Stephanie Eikenberry ("Eikenberry") who also worked out of the Mt. Pleasant office. For her part, Eikenberry reported to a Vice-President Market Leader, John Tyrrell ("Tyrrell"), who worked out of state, and Tyrrell reported to a Division Manager.

20.    That upon information and belief, none of plaintiff's coworkers or his supervisors suffered from a known disability or a history of taking medical leave.

21.    That at the time of plaintiff's hiring, plaintiff was relatively healthy and the symptoms of his disabilities were stabilized for the most part due to treatment, i.e., counseling

and medication and the lack of any negative outside stressors.  Thus, plaintiff did not self-report any of his disabilities. Plus, plaintiff was careful about disclosing his impairments since they are mental impairments and often give rise to negative and unfair stigmas.

22.    That during plaintiff's employment at defendant he performed his job duties in an above-satisfactory fashion and otherwise maintained an excellent employment record there. To this point, although plaintiff was never given a formal written performance evaluation during his time at defendant, plaintiff was given verbal evaluations every six (6) weeks by his Branch Manager, Eikenberry.  Plaintiff estimates that during his short career at defendant he was given four (4) or five (5) verbal evaluations, with the final one taking place in or around late September of 2021 by Eikenberry and her boss Tyrrell, the Regional Manager.  On all of the above evaluations plaintiff was given positive feedback and overall high ratings indicating that plaintiff was a strong performer.  Significantly, plaintiff was given positive ratings on his final review in or around late September of 2021, which occurred approximately one (1) week before plaintiff's last day of work at defendant.

23.    That in addition to the above, plaintiff's supervisors, and management in general, would praise plaintiff for his work performance, work ethic, and dedication to the company.  Given that all of plaintiff's evaluations were verbal, plaintiff relied on these comments and praise to help gauge his performance at defendant.  When it came to the most important metric of plaintiff's job:  generating revenue, plaintiff always met, and usually exceeded, that goal.

24.    That finally, plaintiff was never formally disciplined at defendant during his entire employment there – even though defendant has and follows a corrective action policy

requiring it to give warnings and notices to an employee before termination, for all but the most serious offenses.

25.    That consistent with plaintiff's high-level of performance at defendant, plaintiff earned a salary there of around $160,000 a year plus full benefits.  Plaintiff is and was very good at what he did; he was familiar with the duties of the job; and he enjoyed working at defendant.  Plaintiff's intention was to make his employment at defendant a long-term venture and to stay there until he retired.

26.    That in the beginning months of plaintiff's employment, the symptoms of his disabilities were reasonably stabilized with treatment.  While plaintiff's performance was always above expectations, he was always in a battle with the symptoms of his impairments.  Still, in starting his job at defendant, plaintiff found purpose and direction again.  He drank less.  And, around this time plaintiff was even taken off some of his medications.

27.    That however, by the spring of 2021 plaintiff's mental health started to take a turn for the worse.  In or around March or April of 2021, plaintiff was diagnosed with depression.  By in or around June or July of 2021, plaintiff was suffering from severe depression and anxiety which were accompanied by suicidal ideations.  At this point plaintiff suffered from his usual baseline depression but it was being exacerbated by a difficult divorce that was coming to an end, harassment by his supervisor, and his addiction issues.

28.    That in or around June of 2021, plaintiff's stress and depression became so bad that he had to take three (3) days off of work, all for medical reasons.  Nevertheless, plaintiff timely returned to work and resumed the satisfactory performance of his job duties.

29.    That in regard to plaintiff's supervisor, Eikenberry, began to harass plaintiff on a repeated basis, all because of, or related to, plaintiff's impairments.  To this point, after she

7

became aware of plaintiff's disabilities and/or after plaintiff began to miss work because of them, Eikenberry would yell at plaintiff at least once every two (2) weeks and she would constantly berate plaintiff for asking the same question repeatedly – a circumstance directly related to plaintiff's disabilities. She would also tell plaintiff to do one task and then quickly reverse the directive; she would nitpick plaintiff's work performance without cause; treat plaintiff in a rude manner; and she gave plaintiff a hard time about taking PTO leave.

30. That on this latter point, in or around late July of 2021, plaintiff asked Eikenberry if he could travel to Tennessee for about two (2) days to see his favorite aunt who was seriously ill in hospice care and not given long to live. Having studied the defendant's policy on the issue, plaintiff also asked Eikenberry if he could continue to work while in Tennessee, as defendant's policies authorized an advisor to work while on leave out of state if the advisor was already licensed in the state he planned to visit (and plaintiff was licensed in Tennessee). Eikenberry responded to the request by angrily denying it in a loud, hostile and rude manner and without cause. She was visibly angered by plaintiff's request to miss work as evidenced by the volume and tone of her voice and her demeanor. Plaintiff never did get to see his aunt before she passed. This harassment occurred many times, on a repeated basis; it was based upon and related to plaintiff's disabilities; it interfered with the terms and conditions of plaintiff's employment; and, defendant knew it was occurring (or should have known), yet failed to stop it.

31. That Eikenberry would also have one-on-one meetings with plaintiff (in addition to the performance evaluations). During some of these one-on-one meetings, and whenever Eikenberry would admonish plaintiff for asking the same question repeatedly, plaintiff would tell her that he suffered from a learning disability and that he was on medication for

anxiety, depression and ADHD.  Eikenberry did not treat the other Financial Advisors in this way.  Instead, she treated them with more respect, she was more patient with them, and she did not treat them in an angry and antagonistic manner.

32.   That while plaintiff had been self-medicating with alcohol during this time, he never drank at work or came to work impaired.  Plaintiff restricted his alcohol consumption to weekends or after work hours.   And, plaintiff's drinking did not interfere with his work performance as evidenced by his favorable evaluations.  Plaintiff continued to perform his job at defendant in an exemplary manner.

33.   That sometime in or around August of 2021, while the above outside issues were taking their toll on plaintiff, Eikenberry spoke to Employee Relations Specialist Walker Lambert ("Lambert") about giving plaintiff a Memo of Expectations for the following alleged conduct:  carrying a pocket knife to work (like many people do without punishment); engaging in sexual discussions with a male friend/coworker in a bar after work hours (which is not a violation of any work rules to plaintiff's knowledge); not being forthright (a false allegation not backed up by any facts); boasting about sales performance (plaintiff was excited about how well he was doing); asking the same question twice (a function of plaintiff's disabilities); and loud, aggressive responses to coachings (again, false, exaggerated charges).  To illustrate the level of animus Eikenberry held towards plaintiff, she even tried to falsely accuse plaintiff of engaging in odd sexual conduct like adjusting his pants and crotch area in the workplace and changing his shirt in his office down to a t-shirt.  When plaintiff told Eikenberry that the charge that he adjusted himself at work was absurd and that he changed his shirt in his office because it was too hot in the office and that he had made prior complaints to the facility about that, Eikenberry

dropped those last two (2) charges.  To be sure, the above allegations were false and/or other similarly-situated employees engaged in the same or similar offenses but were not disciplined.

34.   That during the time Eikenberry was discussing the Memo of Expectations with Lambert, Lambert also had conversations with plaintiff wherein plaintiff disclosed his disabilities and symptoms to Lambert.   Also during this process, plaintiff objected and complained to Eikenberry and Lambert that, since he suffered from ADHD and anxiety, it was legally improper for them to base the Memo of Expectations, at least in part, on the fact that he asked "too many questions," thereby engaging in protected activity under the ADA/ADAAA.

35.   That ultimately defendant (by and through Lambert and Eikenberry) directed plaintiff to take a medical leave of absence for what ended up being two (2) weeks.  During the process plaintiff was required to fill out forms for medical leave and to authorize his psychiatrist and/or psychologist to provide defendant with his medical information identifying plaintiff's impairments and his treatment for them.  Of course plaintiff did as instructed, ensuring all forms were timely turned in.  Thus, defendant was fully aware of plaintiff's specific disabilities.

36.   That in going out on medical leave, employees in defendant's Human Resource and Leave of Absence ("LOA") Departments, as well as his supervisor, assured plaintiff that he was covered by the Company's FMLA policies during his two (2) weeks of medical leave, despite the fact that plaintiff had not been employed with defendant for a year (as required by the FMLA).  Also around this time, those same persons began to assure plaintiff in a strong and serious manner that plaintiff should not worry about his job while out on medical leave – that he was "covered" and/or "protected."

37.   That at the same time plaintiff confirmed that he indeed would be covered by the FMLA by reviewing the defendant's Leave of Absence Guide which on page 2 states that

employees who had not yet been employed with the company for a year were nevertheless covered by defendant's FMLA leave policies.

38.    That thereafter, plaintiff took two (2) weeks of medical leave and then returned to work as directed, continuing to perform his job in a strong fashion and in a manner that met defendant's expectations.  Moreover, though the alleged offenses plaintiff was charged with in the said Memo of Expectations were, for the most part, false or not valid, plaintiff never engaged in any of the enumerated conduct again.

39.    That in or around the last week of September of 2021, Eikenberry and her boss, Tyrrell, met with plaintiff via Skype to provide plaintiff with what would turn out to be his last evaluation with the company.  This review was a very positive one, with both management employees telling plaintiff how impressed they were with his performance and otherwise giving plaintiff an overall strong rating on the evaluation.

40.    That matters came to a head when, late on Thursday night, October 7, 2021 and early Friday morning, October 8, 2021, plaintiff left his home to drive to a local gas station/convenience store to grab a late-night snack.  Earlier that evening plaintiff had consumed a small amount of alcohol; he had taken Xanax as well as some Nyquil to combat allergies.  Still, by the time plaintiff left to get a snack, he was not impaired.  Accordingly, plaintiff drove to the convenience store but, when he got there, it was closed.  On the way back home, plaintiff lost control of his car, blowing out two (2) tires which rendered the vehicle undriveable.  Because he was sober and unimpaired, and stuck with an undriveable car late at night, plaintiff called the police for assistance.  However, when the police arrived, they gave plaintiff some field sobriety tests and asked him to submit to a breathalyzer test.  When plaintiff refused to submit to the breathalyzer test, he was arrested for suspicion of DUI and taken to jail.

41.    That plaintiff did not get out of jail until late that afternoon (at around 2:00 – 2:30 p.m. on Friday, October 8, 2021).  As a result, plaintiff was unable to timely report to work or call in before his workday began on Friday.  When plaintiff was released from jail he was in a full-blown mental crisis – suffering from severe anxiety and depression, confusion, and thoughts of suicide.  Plaintiff was in no condition to talk to anyone that day other than his family (which he did) or a medical provider.  Yet work was important to plaintiff and plaintiff loved his job at defendant.  As such,  one of the first calls plaintiff made upon his release from jail was to Lambert in Human Resources at about 3:05 p.m. (as Eikenberry was on her last day of a scheduled vacation) and spoke to him for about nine (9) minutes, according to plaintiff's call log.

42.    That although plaintiff does not remember the conversation verbatim, he does recall telling Lambert that he had wrecked his car; that he had been arrested and charged with some type of DUI-related offense; that he was not in good shape; and that he was not doing well.  Plaintiff does not recall discussing returning to work on Monday with Lambert.

43.    That the rest of that day and over the weekend, matters only got worse for plaintiff.  With plaintiff's anxiety and depression spiraling out of control, and no one there to console or guide him, plaintiff spent most of the weekend in his room, alternating from long bouts of sleep to bouts of panic and thoughts of suicide.  At one point plaintiff even placed a loaded gun in his mouth.  Ultimately, plaintiff overdosed on his anxiety medication (Xanax), almost ending his life that weekend.

44.    That fortunately late Sunday night at around 10:00 p.m. plaintiff's family members (his mother, stepfather and sister) arrived in Charleston from New York and Florida to provide support to plaintiff and to assess the situation.  Once in town, and after observing and speaking to plaintiff, plaintiff's family members began an intervention of sorts, advising plaintiff

he should not be returning to work on Monday but, instead, that he should be checking into an inpatient treatment facility.  On this point plaintiff's family was insistent.

45.   That due to their late arrival on Sunday night and plaintiff's poor mental condition, plaintiff's family did not have much time on Sunday to discuss the issue with plaintiff or to otherwise guide and prevail upon him to enter a treatment facility rather than going to work.

46.   That early Monday morning plaintiff's family resumed their intervention, advocating that plaintiff seek treatment immediately and not return to work, and they continued to search for treatment facilities for plaintiff.  All the while, plaintiff was still in a depressed, anxious and foggy state of mind.

47.   That plaintiff did not object to going to rehabilitation because he knew he needed it, but he was in bad shape mentally and he did not want to miss a lot of work or risk losing his job at defendant.  On top of that, plaintiff's family was still trying to find suitable rehabilitation facilities for the plaintiff to attend.

48.   That thus, by early Monday morning, and for the next two (2) days, plaintiff did not know whether or when his family would find a facility for him; whether or when he would have to pack his bags and leave; and if so, he did not know how long he would be gone. Thus, plaintiff did not know what to tell the defendant about his potential leave because plaintiff did not know. However, plaintiff did communicate with defendant on many occasions; he advised them of the nature of his disabilities and symptoms; and he otherwise cooperated with defendant.

49.   That in general, plaintiff called in to work several times on Monday and Tuesday (October 11 and 12, 2021) and in good faith tried to tell the defendant when and if he would be returning to work.  Still in a weak and fragile mental condition, and still looking for

treatment centers, on plaintiff's first call to the defendant Monday morning, he stated he would be in to work first thing Monday morning. Later that day plaintiff called in stating that he could not make it to work in the morning but that he would report to work that afternoon. Thereafter, plaintiff called in to defendant stating he would be out on medical leave until Wednesday, October 13, 2021. And finally, plaintiff called defendant stating he needed extended medical leave of approximately thirty (30) days to travel to an inpatient treatment facility immediately. It was a changing situation and plaintiff did all he could to tell the defendant what was happening on his end.

50.    That more specifically, plaintiff's phone records for the days in question indicate that on or about Monday, October 11, 2021 at 7:37 a.m. plaintiff called his supervisor, Eikenberry; at 7:44 a.m. plaintiff called Human Resources; and at 8:32 a.m. that day plaintiff exchanged a set of text messages with Eikenberry, telling her he had to use his PTO; that he had to miss work until Wednesday; and asking for the phone number to Human Resources. Eikenberry responded immediately by thanking plaintiff for the "heads up" and by providing him with the correct number to Human Resources. Finally, plaintiff's phone records show that at 9:18 a.m. that day he called Human Resources again.

51.    That plaintiff's phone records for Tuesday, October 12, 2021 show that at 8:15 a.m. that day he called Eikenberry; that at 8:33 a.m. plaintiff sent Eikenberry a text message advising he had tried to call her; that at 2:03 p.m. plaintiff called Eikenberry again; and at 4:06 p.m. Human Resources called plaintiff. During most of the above-referenced calls between defendant and plaintiff, plaintiff had his speaker phone on and his mother was right next to him, which allowed plaintiff's mother to hear both sides of most, if not all, of the conversations. By this time plaintiff had advised defendant that he was going to inpatient treatment and needed to

14

take extended medical leave for approximately thirty (30) days and that he and his family had already selected which facilities plaintiff was going to attend.

52.    That also on Tuesday, October 12, 2021, Eikenberry, Lambert, and the LOA Department appeared to all be on board with plaintiff's decision.  Eikenberry responded to plaintiff's request for long-term leave to seek treatment by instructing plaintiff to call her with any work-related issues.  And Eikenberry and Lambert, as well as representatives in the LOA Department, advised plaintiff before he left for treatment not to worry about his job while he was away on medical leave; they assured plaintiff in strong terms that he would be ***protected*** and/or covered during his absence, and to just "get better."  Plaintiff relied upon these assurances in deciding whether or not to take medical leave.

53.    That as such, plaintiff contacted and communicated with defendant about his impairments and leave as directly as he could under the circumstances, and he did so in a manner that was consistent with defendant's own leave policies.  Plaintiff provided defendant with enough information about his impairments and medical leave to make defendant aware of the nature of his medical impairments and plaintiff also articulated the type of accommodation he needed and requested that defendant provide him with it.  Based on the above, plaintiff engaged in protected activity under the FMLA and ADA in or around August of 2021 by seeking and taking two (2) weeks of medical leave that was (or should have been) covered by the ADA and FMLA and by objecting to violations of those Acts.  Moreover, plaintiff engaged in protected activity again on or about October 11, 12 and 13, 2021 by requesting FMLA leave and by requesting a reasonable accommodation under the ADA in the form of short-term medical leave of a limited duration and then by using or taking said FMLA and ADA accommodation leave.

54.   That on or about early Thursday morning, October 14, 2021, plaintiff left Charleston and flew to Massachusetts where he checked into Bedrock Recovery Center that day. Plaintiff stayed at the facility for seven (7) days of detoxification and, thereafter, plaintiff immediately transferred and checked into Springhill Recovery Center for about 28 days of intense inpatient treatment.

55.   That at both treatment centers plaintiff complied with all requirements and rules and successfully completed the programs with no issues whatsoever.  After all, plaintiff voluntarily entered the rehabilitation centers and he was serious about getting well and sober and keeping his job at defendant.

56.   That on or about October 25, 2021, while still in rehabilitation, plaintiff received correspondence from Andrew Stidham ("Stidham"), an employee on defendant's Solutions Leave of Absence Accommodation Team (that was also copied to Eikenberry), stating that plaintiff's leave request had been ***approved*** from October 8, 2021 until January 1, 2022 ***based upon documentation Fidelity had received from plaintiff's healthcare provider.***

57.   That by mid-November of 2021, plaintiff had successfully completed his out-of-state treatment programs.  On or about November 17, 2021 plaintiff returned to Charleston entirely sober, in good shape, compliant with his treatment programs, and ready to resume his employment at defendant.  Once back home, plaintiff continued his treatment programs by seeing his psychologist and psychiatrist on a regular and consistent basis.  Plaintiff had made the right decision by going to treatment and he was eager to get back to work.  However, plaintiff's medical leave did not expire for another six (6) weeks – on January 1, 2022.

58.   That plaintiff had also contacted defendant's Compliance Department and asked if his October 8th incident had to be reported to the appropriate licensing agency.  On or

about November 27, 2021 defendant's Compliance Department sent plaintiff an email stating the event ***did not*** give rise to a reportable event at the time and requesting that they be provided with updates when the matter was concluded. As to plaintiff's pending criminal charges, he ended up pleading *nolo contendere* to a traffic offence – DUAC. As such, the event was not reported, and was never reportable.

59.   That in or around mid-November of 2021 after plaintiff returned home from treatment, plaintiff contacted defendant, letting them know that he was back home; that he had successfully completed his treatment programs; and that he was ready to return to work immediately, even though he had been approved to take leave until January 1, 2022. Defendant did not respond to plaintiff's request in a meaningful manner.

60.   That on or about November 30, 2021, while plaintiff was still out on medical, FMLA and ADA accommodation leave, Eikenberry and Lambert contacted plaintiff via Skype. After the typical salutations, Eikenberry started the conversation by stating words to the effect that: "Thinking about the events from Friday, October 8, 2021, through Tuesday, October 12, 2021, your lack of direct communication with the company, your unavailability, your unplanned absences, and not taking full ownership for the absences during your October 8th through 12th conversations with the company, and the disruption to the office arising from those absences, we have decided to terminate you." In response to the news, plaintiff audibly moaned or groaned.

61.   That surprised and caught off guard, plaintiff's initial comments (while attempting to process this news) were polite and conciliatory. However, plaintiff quickly got on his feet and repeatedly stated that he thought he was "protected," echoing the words of his terminators from just a month ago and the language from defendant's own policy; plaintiff

repeatedly stated he had been hospitalized for over a month; that his absences were health related; and he asked for the reasons for his termination. However, whenever plaintiff tried to give his side of the story, Lambert abruptly cut plaintiff off, refusing to allow plaintiff to state his case.

62.   That at one point during the said meeting, Eikenberry clarified that plaintiff was terminated because his communications with the company from October 8-12, 2021 were not always accurate since, at first, plaintiff said he was returning to work but then did not. Of course, plaintiff responded that he was incoherent at the time; that all of his absences were health related; and that he loved working at Fidelity. Plaintiff ended his remarks by expressing grave concern about his Form U5 and stated that if Fidelity indicated a "termination for cause" on his Form U5, that it could ruin his career. As such, plaintiff asked defendant if he could resign and if defendant could put a less-damaging description of his departure from defendant on his Form U5 other than "termination for cause." Lambert stepped in and tried to clean up some of Eikenberry's verbiage, but it was clear the decision had been made and that it came from Eikenberry and others.

63.   That the reasons given to plaintiff for his termination were false and/or unworthy of credence as plaintiff did communicate directly with the defendant several times from October 8-12, 2021 about his medical leave and he most certainly did take ownership of those absences. Otherwise, plaintiff's unavailability, the unplanned nature of his absences, and any disruption to the office all related directly to plaintiff's serious disabilities. Plaintiff was really fired for discriminatory reasons.

64. That despite plaintiff's repeated requests, the defendant would not let him resign and it filed a Form U5 indicating that plaintiff had been fired for cause, the most harmful designation on the form.

65. That after plaintiff's termination he fell back into a deep depression to the point plaintiff's physicians were urging him to go back into inpatient treatment. Plaintiff did as instructed and subsequently checked into intensive inpatient treatment for six (6) hours a day. Thereafter, plaintiff was placed into a program which required partial hospitalization through March of 2022. All of the above was caused by defendant's discriminatory conduct towards plaintiff.

66. That in reality, defendant fired plaintiff:

    a) Because of his disabilities;

    b) Because of his perceived disabilities;

    c) Because of the medical leave associated with plaintiff's disabilities;

    d) In retaliation for engaging in protected activity, namely, requesting and using a reasonable accommodation in the form of short-term medical leave and by objecting to conduct that violated the ADA; and

    e) In retaliation for exercising his rights under the FMLA by requesting and taking FMLA leave.

67. That moreover, defendant harassed plaintiff because of his disabilities (and/or perceived disabilities) and for taking medical leave associated with his disabilities. And, defendant wholly failed to enter into dialogue (or an interactive process) with plaintiff regarding his disabilities and potential accommodations.

68. That after firing plaintiff, and after plaintiff filed the above-described Charges of Discrimination, defendant continued to retaliate against plaintiff by slandering him,

by disclosing his private medical information to third parties, and by interfering with his prospective contract relations.

69.    That to this end, after being fired plaintiff found other employment with JP Morgan, performing the same job he held at defendant.

70.    That at the new job plaintiff was speaking to a married couple about investing their money with him and JP Morgan.

71.    That on or about September 9, 2022 plaintiff had his initial meeting with the said couple.  The meeting was a positive one with the couple telling plaintiff they were interested in hiring him and his firm but that they were interviewing several other firms, including plaintiff's former employer, the defendant, among others, before making a decision.

72.    That based on the positive nature of the first meeting, on or about September 23, 2022, the couple again met with plaintiff in their efforts to select a person (and company) to invest their money.  The second meeting between plaintiff and the couple went very well and it began to look like the couple was going to hire plaintiff to invest their money.

73.    That on or about October 7, 2022, plaintiff met with the couple for a third time, which is typically when the prospective client makes their decision and commitment to hire plaintiff and his new firm.

74.    That like the previous two (2) meetings with the couple, the third meeting went very well except that during the meeting the wife reminded plaintiff they were still interviewing Fidelity (the defendant) and she began to ask plaintiff a lot of questions about his past employment with the defendant.

75.    That plaintiff honestly and politely answered the woman's questions.  At some point during the exchange, the woman stated that Fidelity had told her that they had fired

plaintiff; that plaintiff was crazy; that plaintiff had a personality disorder; and that defendant fired plaintiff because he was crazy and suffering from personality disorders.  In response, plaintiff calmly explained to the couple that Fidelity's statements about him were untrue and/or stated out of context.

76.    That still, the couple scheduled a fourth meeting with plaintiff for October 21, 2022.  However, before the meeting took place, the wife called and cancelled the meeting.

77.    That subsequently plaintiff confirmed that the couple signed up with the defendant, Fidelity.

78.    That defendant slandered plaintiff, disclosed his private medical information, and interfered with plaintiff's prospective contract relations by making damaging and false statements to plaintiff's prospective clients, all because of plaintiff's disabilities, his perceived disabilities, and because plaintiff engaged in protected activity both before his termination (as alleged) and after his termination (by filing a Charge of Discrimination with the EEOC).

**FOR A FIRST CAUSE OF ACTION:**
**VIOLATION OF THE ADA/ADAAA**
**42 U.S.C. § 12101, et seq.**
**TERMINATION**

79.    That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 78 hereinabove as fully as if set forth verbatim.

80.    That as alleged above, at all pertinent times as defined by the ADA/ADAAA, defendant employed fifteen (15) or more employees and, thus, is an "employer" as defined by said Act and otherwise subject to it.

81.    That as a result of plaintiff's impairments, namely ADHD, anxiety, borderline personality disorder, depression and addiction, plaintiff was substantially limited in one or more

major life activity, including, but not limited to, thinking, concentrating, sleeping, listening, focusing, and interacting with others

82.   That at the same time, plaintiff could perform the essential duties of his job at defendant with reasonable accommodations in the form of short-term medical leave and/or intermittent medical leave.  Moreover, defendant regarded or perceived plaintiff to be disabled.

83.   That as such, the plaintiff is disabled as defined by the ADA/ADAAA and/or the defendant regarded or perceived plaintiff to be disabled as defined by that Act.

84.   That as alleged, plaintiff performed his job duties at defendant in a manner that met defendant's legitimate expectations as, just prior to his medical leave and termination, plaintiff received a positive performance evaluation and received praise from upper management.  He also was meeting his financial metrics at all times.

85.   That despite the above, defendant fired plaintiff without warning, notice or cause (even though the defendant has and uses a progressive discipline policy) and for false and vague reasons and/or reasons unworthy of credence, and under circumstances which give rise to an inference of discrimination.   Specifically, plaintiff was fired while still out on medical/ADA accommodation leave, five (5) weeks after last requesting ADA accommodation leave, and thirteen (13) days after plaintiff returned from treatment and requested to go back to work; plaintiff was a strong employee, having received a positive performance evaluation just one (1) or two (2) weeks before going out on medical leave; defendant fired plaintiff without obtaining plaintiff's side of the story and without following its progressive discipline policy; Eikenberry began to treat plaintiff in an antagonistic fashion as soon as plaintiff started to take leave related to his disabilities; defendant admitted to one of plaintiff's prospective clients at his new job that it fired plaintiff because of his

disabilities; and the reasons defendant gave plaintiff for his termination were false or not credible and they all related to plaintiff's disabilities.

86.    That in reality, defendant fired plaintiff because plaintiff is disabled and/or because defendant perceived or regarded plaintiff as disabled and/or because of past and future absences plaintiff took (or would need to take) as a direct result of his disabilities.  In addition, defendant did not want to contend with future absences or the medical insurance expenses related to plaintiff's disabilities.

87.    That as such, defendant violated the ADA/ADAAA.

88.    That as a result of defendant's actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, physical and personal injuries and illness and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

89.    That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously, knowingly, and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

**FOR A SECOND CAUSE OF ACTION:**
**VIOLATION OF THE ADA/ADAAA**
**RETALIATION**
**42 U.S.C. § 12203**

90.    That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 89 hereinabove as fully as if set forth verbatim.

91.    That as alleged above, at all pertinent times as defined by the ADA/ADAAA, defendant employed fifteen (15) or more employees and, thus, is an "employer" as defined by said Act and is otherwise subject to it.

92.    That plaintiff engaged in protected activity under the ADA/ADAAA on several occasions by requesting and using a reasonable accommodation in the form of short-term medical leave of a limited duration and by complaining about and/or opposing discrimination prohibited by the ADA/ADAAA.  Plaintiff last engaged in protected activity on or about October 11-14, 2021 when he requested an accommodation under the ADA in the form of short-term medical leave of a limited duration and from October 14 through November 17, 2021 when he used his reasonable accommodation by going to rehabilitation.

93.    That on or about November 30, 2021, shortly after plaintiff last engaged in protected activity defendant fired plaintiff, all without warning, notice or cause and for false reasons or reasons unworthy of credence.  Specifically, defendant fired plaintiff while plaintiff was still on medical/ADA accommodation leave, within five (5) weeks of plaintiff requesting a reasonable accommodation in the form of short-term medical leave, and within two (2) weeks of plaintiff returning from said leave and requesting to return to work.  As such, a causal connection exists between plaintiff's protected activity and his termination based upon the timing evidence set forth above, among other things.  In addition to the above, after plaintiff's termination and approximately six (6) weeks after plaintiff filed his initial Charge of Discrimination against defendant with the EEOC, defendant continued to discriminate and retaliate against the plaintiff by, among other things, slandering plaintiff, interfering with plaintiff's prospective contractual relations, and disclosing plaintiff's private medical information, all in regard to plaintiff's prospective clients at his new job (and others).

94.    That based on the above, along with the allegations contained in Paragraph 85 above, defendant fired plaintiff and engaged in post-termination retaliation against him all in retaliation for plaintiff engaging in activity protected by the ADA/ADAAA and defendant has thereby violated the Retaliation provision of the ADA (42 U.S.C. § 12203).

95.    That as a result of defendant's actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, physical and personal injuries and illness, and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

96.    That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

### FOR A THIRD CAUSE OF ACTION: VIOLATION OF THE ADA/ADAAA HARASSMENT/HOSTILE ENVIRONMENT BASED ON DISABILITY

97.    That the plaintiff hereby realleges each and every allegation contained in Paragraphs 1 through 96 hereinabove as fully as if set forth verbatim.

98.    That at all pertinent times defendant employed fifteen (15) or more employees and, as such is an "employer" as defined by the ADA/ADAAA, and otherwise subject to the said Act.

99.    That as alleged, plaintiff suffers from impairments that render him disabled under the ADA/ADAAA.  Yet, he could still perform the essential duties of his job at defendant with reasonable accommodations in the form of short-term medical leave of a limited duration and/or intermittent leave.  Moreover, defendant regarded or perceived plaintiff as being disabled. As such, plaintiff was a covered employee under the ADA/ADAAA.

100. That defendant's conduct (by and through Eikenberry and others) against plaintiff was motivated by plaintiff's disabilities and/or perceived disabilities.  Moreover, the conduct was repeated, continuous, and severe enough to affect the terms and conditions of plaintiff's employment at defendant.

101. That defendant's harassment of plaintiff entailed, but was not limited to, nitpicking plaintiff's work without cause, disciplining plaintiff for false reasons or reasons unworthy of credence, forcing plaintiff to go out on medical leave in August of 2021, conversely by discouraging plaintiff from taking medical leave in the fall  of 2021, and by treating plaintiff in a rude and antagonistic manner, all as alleged above.

102. That defendant's behavior humiliated plaintiff, unreasonably interfered with his work performance, affected the terms, conditions and privileges of his employment at defendant and otherwise caused plaintiff severe psychological and physical harm.  Moreover, the harassment was pervasive and severe and happened on repeated occasions.

103. That plaintiff objected to the harassing conduct and was offended by it.

104. That defendant's actions as alleged above, created a work environment that plaintiff found, and a reasonable person would find, hostile and abusive.

105. That defendant was aware of the harassment as plaintiff complained about the above-described harassment directly to defendant on numerous occasions and defendant was

otherwise on notice that the harassment was occurring as it occurred openly and on a widespread basis at the defendant and supervisors at defendant engaged in the harassment against plaintiff.

106. That despite the above, defendant wholly failed to take prompt and effective remedial action to end the harassment, and defendant continued to harass and discriminate against the plaintiff due to his disabilities, even after plaintiff complained about the harassment and/or after defendant became aware of the harassment or should have been aware of it.

107. That the actions of defendant in subjecting plaintiff to unwanted harassment, all as described above, constitutes discrimination against plaintiff based on his disabilities and/or perceived disabilities in violation of the ADA/ADAAA.

108. That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries and illness, and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

109. That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

**FOR A FOURTH CAUSE OF ACTION:**
**VIOLATION OF THE ADA/ADAAA**
**42 U.S.C. § 12110, et seq.**
**FAILURE TO ENGAGE IN DIALOGUE**
**REFUSAL TO ACCOMMODATE**

110. That the plaintiff hereby realleges each and every allegation contained in Paragraphs 1 through 109 hereinabove as fully as if set forth verbatim.

111. That as alleged above in a more specific manner, plaintiff repeatedly sought and requested that defendant provide him with reasonable accommodations and repeatedly advised defendant that he was suffering from several serious impairments, all of which he identified to defendant's upper management and to its Human Resource Department.

112. That despite the above, no one at defendant engaged in (or attempted to engage in) dialogue with plaintiff or in any other type of interactive process with plaintiff, whereby plaintiff's disabilities and potential accommodations for those disabilities were discussed, all as required by the ADA/ADAAA.

113. That the defendant's refusal to engage plaintiff in the said dialogue or interactive process violates the ADA/ADAAA. Had defendant properly engaged in dialogue with the plaintiff, plaintiff would not have been wrongfully terminated.

114. That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries and illness, and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

115. That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

**FOR A FIFTH CAUSE OF ACTION:**
**VIOLATION OF THE FMLA**
**(29 U.S.C. §§ 2601-2654)**
**(RETALIATION/INTERFERENCE)**

116. That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 115 hereinabove as fully as if set forth verbatim.

117. That pursuant to the FMLA, plaintiff had been employed with defendant for over 12 months, had provided over 1,250 hours of service to defendant during the 12 months prior to his leave, and was otherwise employed at a work site where 50 or more employees are employed by defendant within 75 miles of the work site. Alternatively, defendant's own policies state that plaintiff is covered by, and defendant is subject to, the FMLA even though plaintiff had not been employed at defendant for one (1) year.

118. That defendant is engaged in commerce and/or an industry or activity affecting commerce, and employs 50 or more employees each working day during each of 20 or more work weeks in the current or preceding calendar year.

119. That as such, plaintiff is a covered employee and defendant is a covered employer as defined by the FMLA.

120. That plaintiff was suffering from a serious health condition as defined by the FMLA, as his illnesses and impairments required inpatient treatment and/or continuing treatment by a healthcare provider, which included the prescription of several medications to plaintiff. Moreover, plaintiff's illnesses and impairments are chronic, permanent and long-term conditions.

121.   That plaintiff exercised his rights under the FMLA (and thereby engaged in protected activity) several times by requesting and taking (or using) FMLA leave, or leave that should have been covered by the FMLA.  Plaintiff last engaged in protected activity on or about October 11 through October 14, 2021 when he requested FMLA leave and from October 14 through November 17, 2021 when he took or used FMLA leave.

122.   That shortly after plaintiff exercised his rights under the FMLA (and thereby engaged in protected activity) defendant fired plaintiff while plaintiff was still on FMLA leave and approximately five (5) weeks after plaintiff's last requested FMLA leave (on or about October 11-14, 2021) and approximately thirteen (13) days after plaintiff returned from treatment and requested to return to work.  As such, plaintiff's protected activity is causally connected to his termination.  In addition to the above, defendant continued to retaliate against plaintiff after it terminated him by slandering plaintiff, by interfering with plaintiff's prospective contractual relations, and by disclosing plaintiff's private medial information, all in regard to plaintiff's prospective clients at his new job, and others.

123.   That based upon the above, as well as the allegations contained in Paragraph 85 above, defendant violated the FMLA by terminating plaintiff and by thereafter continuing to retaliate against him after his termination, all because plaintiff exercised his rights under the FMLA in requesting and taking FMLA leave.

124.   That as a result of the defendant's actions as set forth above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, medical bills, expenses associated with finding other work, economic injury, attorney's fees and costs, and prejudgment interest.

125. That moreover, defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover liquidated damages from defendant.

## FOR A SIXTH CAUSE OF ACTION:
## SLANDER PER-SE

126. That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 125 hereinabove as fully as if set forth verbatim.

127. That defendant (by and through its management employees in their Charleston office) published false and defamatory statements about the plaintiff to plaintiff's prospective clients as alleged above and to lower-level employees at the defendant without a need to know by telling them that plaintiff was crazy and mentally unstable and that it fired plaintiff for those reasons.

128. That all of the statements or publications referred to above concerned the plaintiff, are false, and were made by defendant without justification, without privilege and with implied and actual malice.

129. That the statements referred to above are actionable per-se, in that they allege plaintiff is unfit to carry on in his given trade and profession.

130. That defendant's publications as outlined above had a defamatory and slanderous meaning, impeached the honesty and integrity of the plaintiff and thereby exposed him to public hatred, contempt, ridicule, and caused him to be shunned and avoided and to suffer loss to his reputation, embarrassment, humiliation, emotional distress, pain and suffering, and loss of enjoyment of life.

131. That defendant's actions as outlined above resulted in special, general and presumed damages to the plaintiff.

132. That as a direct result of defendant's conduct as set forth above, plaintiff has suffered damages in the form of loss to reputation, lost back and future wages, income and benefits, costs associated with finding other work, psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, loss to professional standing, character and reputation, embarrassment, humiliation, physical and personal injuries and illness, and prejudgment interest.

133. That defendant's conduct as described above was undertaken by defendant intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the protected rights of the plaintiff and, therefore, plaintiff is entitled to recover punitive damages from the defendant.

**FOR A SEVENTH CAUSE OF ACTION:**
**INTENTIONAL INTERFERENCE WITH**
**PROSPECTIVE CONTRACT RELATIONS**

134. That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 133 hereinabove as fully as if set forth verbatim.

135. That defendant interfered with plaintiff's prospective contract relations by telling plaintiff's potential clients false, damaging and/or private information about plaintiff, including that plaintiff was crazy; that he was mentally unstable; that he suffered from mood disorders; and that he was fired by defendant for said reasons.

136. That defendant engaged in the above conduct for an improper purpose and/or by using improper methods, namely because plaintiff engaged in protected activity under the ADA/ADAAA and the FMLA while employed with the defendant and thereafter, and in an effort to take the plaintiff's clients away from him

137. That as a direct result of defendant's conduct, plaintiff has suffered damages as the said prospective client decided ***not*** to retain plaintiff and his firm, instead deciding to retain the defendant.

138. That as a direct result of the above, plaintiff has suffered damages in the form of the loss of income and commissions he would have received had his prospective clients referred to herein (and other prospective clients) retained plaintiff (and his firm's) services. Plaintiff has also suffered severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing character and reputation as well as physical and/or personal injuries and illnesses as a direct result of defendant's said conduct.

139. That defendant's conduct as described above was undertaken by defendant intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the protected rights of the plaintiff and, therefore, plaintiff is entitled to recover punitive damages from the defendant.

WHEREFORE, plaintiff prays for the following relief against defendant:

(a)     As to plaintiff's First, Second, Third and Fourth Causes of Action (under the ADA/ADAAA), plaintiff prays for the following relief against defendant: for such amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income and benefits, expenses associated with finding other work, medical bills, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries and illness), punitive

damages, the costs and disbursements of this action, including his reasonable attorney's fees, prejudgment interest and for such other and further relief as the court deems just and proper;

(b)    As to plaintiff's Fifth Cause of Action (under the FMLA), plaintiff prays for such an amount of actual and special damages as the trier of fact may find (including lost back and future wages, income and benefits, medical bills, expenses associated with finding other work, and other economic injuries), liquidated damages, prejudgment interest, the costs and disbursements of this action, including plaintiff's reasonable attorney's fees, and for such other and further relief as the court deems reasonable, just and proper and

(c)    As to plaintiff's Sixth and Seventh Causes of Action, for such amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income, benefits and commissions, expenses associated with finding other work, loss to plaintiff's reputation, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries and illness), punitive damages, the costs and disbursements of this action, prejudgment interest and for such other and further relief as the court deems just and proper.

HITCHCOCK & POTTS

By: *s/A. Christopher Potts*
Federal ID No.:  5517
222 West Coleman Blvd., Suite 124 #11
Mt. Pleasant, SC 29464
Telephone:  (843) 577-5000
Email:  cpotts@hitchcock-potts.com
***Attorneys for the Plaintiff***

Charleston, South Carolina
October 10, 2023

34